UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

YORKTOWN CENTRAL
SCHOOL DISTRICT,                                    Civil Action No. _____

                    Plaintiff,

          vs.                                       COMPLAINT

MONSANTO COMPANY,
PHARMACIA CORPORATION,
PECORA CORPORATION and
JOHN DOES 1-20.                                     JURY TRIAL DEMANDED

                    Defendants.
-------------------------------------------------------------x

          Plaintiff Yorktown Central School District ("the District" or "Plaintiff") by its attorneys

KENNEDY & MADONNA, LLP for its verified complaint against Defendants, alleges upon

information and belief as follows:

## NATURE OF ACTION

          1.       This is a products liability and negligence lawsuit resulting from Defendants'

design, manufacturing, distribution, marketing, selling and utilization of the now outlawed

carcinogen, Polychlorinated Biphenyls ("PCBs"), in the construction of the District's schools.

This lawsuit seeks damages from Defendants for: (1) remediation costs and expenses, including

attorneys' fees associated with the District's removal and proper disposal of PCBs from its

schools and surrounding areas; (2) any and all future remediation costs and expenses, including

attorneys' fees, to be incurred by the District; (3) any and all incidental and consequential

damages resulting from Defendants' actions including indemnification for any claims regarding

PCB exposure that may be brought against the District by past and/or current students, teachers and/or employees of the District as well as any other persons; and (4) a declaratory judgment declaring that Defendants are responsible for the District's damages as described herein and shall indemnify the District for any and all costs related to (i) past remediation of PCB contaminated materials and property at its buildings; (ii) future remediation costs associated with PCB contamination, and; (iii) any claims regarding PCB exposure that may be brought against the District by past and/or current students, teachers and/or employees of the District as well as any other persons.

## I.    Parties

2.      Plaintiff Yorktown Central School District is a school district existing under the laws of the State of New York.

3.      Defendant Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri.

4.      Defendant Pharmacia Corporation ("Pharmacia") is a Delaware corporation with its principal place of business, according to Pharmacia, in Peapack, New Jersey.  Pharmacia exists as a wholly-owned subsidiary of Pfizer, Inc.

5.      Pecora Corporation ("Pecora") is a Pennsylvania corporation with its principal place of business in Harleysville, Pennsylvania.

6.      Upon information and belief, Defendants John Does 1-20 were distributors, marketers, suppliers, designers or sellers of products containing PCBs.  Although their identities are unknown, their names will be ascertained during discovery at which time Plaintiff will seek leave of this Court to add their actual names to the complaint.

7.     As used herein, the term "Defendants" refers to all Defendantscollectively - Monsanto Company, Pharmacia, Pecora and John Does 1-20.

## II.     Jurisdiction and Venue

8.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

9.     Venue is appropriate in this dispute pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this claim occurred in Westchester County, New York.

## III.     Background

10.     PCBs are mixtures of up to 209 individual chlorinated compounds (known as congeners) manufactured by the Monsanto Chemical Company and its successor, Monsanto Company (collectively referred to as "Old Monsanto"), from 1935 to 1971.

11.     PCBs are either oily liquids or solids that are colorless to light yellow in appearance.

12.     Old Monsanto was the exclusive manufacturer of PCBs in the United States.

13.     Many commercial PCB mixtures are known in the United States by the trade name Aroclor.

14.     There are no known natural sources of PCBs in the environment.

15.     Once in the environment, PCBs do not readily break down and therefore may remain for very long periods of time.

3

16.     Several PCB compounds are considered by the United States federal Environmental Protection Agency ("EPA") to be likely carcinogens.

17.     The manufacture of PCBs was banned in the United States in August 1977 due to its toxic and hazardous characteristics.

18.     PCBs easily cycle between air, water, and soil and are present as solid particles or as a vapor in air.

19.     Heavy kinds of PCBs are more likely to settle into sediments while lighter PCBs are more likely to evaporate to air.

20.     Sediments that contain PCBs can also release PCBs into surrounding waters.

21.     Lighter weight PCBs may leave soil through evaporation and, as a gas, can accumulate in the leaves and above-ground parts of plants and food crops.

22.     Based on the evidence for cancer in animals, the Department of Health and Human Services has stated that PCBs may reasonably be anticipated to be carcinogens.

23.     Old Monsanto was aware of reports in the late 1930's and the 1940's that indicated that prolonged and excessive occupational exposure to PCBs might cause liver effects in humans.

24.     An Old Monsanto memorandum dated September 20, 1955, stated: "We know Aroclors [PCBs] are toxic but the actual limit has not been precisely defined."

25.     An Old Monsanto memorandum issued in the 1950's stated that it was the opinion of Old Monsanto's Medical Department that the eating of lunches in manufacturing process departments, including those in which PCBs were manufactured, should not be allowed.

26.     In late 1968, Old Monsanto received an initial report that some people in Japan became ill from eating rice oil contaminated with Japanese manufactured PCBs.

27.     In 1969, Old Monsanto appointed an ad hoc "committee" to prepare a resume of the situation concerning the environmental contamination through the manufacture and use of PCBs.

28.     A draft document dated October 2, 1969, contained the following statements: "The objective of the committee was to recommend action that will:  1. Protect continued sales and profits of Aroclors;  2. Permit continued development of new uses and sales, and; 3. Protect the image of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or control contamination of the global ecosystem."

29.     A draft document dated October 2, 1969, includes the following statements: "The committee believes there is little probability that any action that can be taken will prevent the growing incrimination of specific [PCBs] (the higher chlorinated - e.g. Aroclors 1254 and 1260) as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish-eating birds.  There are, however, a number of actions which must be undertaken in order to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series."

30.     A draft document dated October 2, 1969, contained the following statement under the heading "Budgetary Considerations":  "The committee recognizes the restrictions placed on those currently involved by mandates to operate within normal or proposed reduced budgets. It

should be clear, however, that the product groups, the Division and the Corporation are faced with an extraordinary situation. There cannot be too much emphasis given to the threat of curtailment or outright discontinuance of the manufacture and sales of this very profitable series of compounds. If the products, the Division and the Corporation are to be adequately protected, adequate funding is necessary."

31.    During 1970, Old Monsanto received reports that cows which ingested PCBs that apparently had been contained in silo sealant produced milk that contained PCBs.

32.    A document dated January 26, 1970, and entitled, "The PCB- Pollution Problem" reflects a January 21 and 22, 1970 meeting between representatives of General Electric and Old Monsanto. This document contained the following statement: "In essence, results reported by Mr. Wheeler on chronic animal toxicity tests and animal reproducibility studies underway are not as favorable as we had hoped or anticipated. Particularly alarming is evidence of effect on hatchability and production of thin egg shells regards white leghorn chickens. The studies involved Aroclor 1242, 1254 and 1260. Some of the studies will be repeated to arrive at better conclusions."

33.    A letter dated October 20, 1974, from Joseph K. Wagoner of the Department of Health, Education, and Welfare, Public Health Service, Center for Disease Control, to Dr. Emmett Kelly at Old Monsanto stated: "A tremendous quantity of research has demonstrated that environmental exposure to [PCB's] causes serious impairment of the functions of the liver."

34.    A 1975 report by EPA sent to Old Monsanto confirmed that PCBs "pose a threat to human health and the environment."

35.    EPA banned the manufacture of PCBs in 1977 because of their toxic effects.

36.     Old Monsanto knew PCBs were hazardous but manufactured and profited from them for more than 40 years with conscious disregard for the rights of others.

37.     In 1997, Old Monsanto spun off certain chemical businesses, including those which previously manufactured PCBs, into Solutia, Inc. ("Solutia"), an independent, publicly owned company.

38.     As part of Old Monsanto and Solutia's agreement, Solutia agreed to indemnify Old Monsanto for claims, expenses and/or liability related to PCBs.

39.     In 2000, Old Monsanto merged with Pharmacia & UpJohn, Inc., and, upon merger, the company changed its name to Pharmacia Corporation.

40.     Later in 2000, Pharmacia Corporation created a wholly owned subsidiary (now publicly traded) called Monsanto Company ("New Monsanto").

41.     New Monsanto agreed to indemnify Pharmacia Corporation for claims, expenses and/or liability related to Old Monsanto's chemical business, including PCBs, to the extent such liability was not covered by the indemnity agreement with Solutia who agreed to also indemnify New Monsanto for claims, expenses and/or liability related to PCBs.

42.     The 2000 Separation Agreement between New Monsanto and Pharmacia Corporation stated that New Monsanto agreed to indemnify Pharmacia Corporation for various liabilities, including PCB lawsuits, "to the extent that Solutia were to fail to pay, perform or discharge those liabilities as contemplated in the Distribution Agreement."

43.     In 2002, New Monsanto, Pharmacia, and Solutia amended their distribution agreement to note that Solutia would indemnify New Monsanto as well as Pharmacia in regard to certain liabilities.

44.     On February 17, 2004, Solutia notified Pharmacia and New Monsanto that it was disclaiming its obligation to defend pending or future litigation related to liabilities it had assumed.[1]

45.     Despite maintaining that Solutia remains obligated to continue to defend such litigation, New Monsanto decided to take the reins in litigation, including settling with adverse parties.

46.     New Monsanto has been active in paying litigation costs and also the costs of settlement of PCB related litigation -- for the benefit of Pharmacia as well as Solutia.  For example, in 2004, New Monsanto paid $1.3 million dollars to plaintiffs on behalf of Pharmacia in PCB litigation in Anniston, Alabama.

47.     Under threat of sanctions from the Department of Justice, New Monsanto also took over the remediation of a PCB-contaminated site in Sauget, Illinois, when Solutia defaulted.

48.     Despite several decades of evidence to the contrary, New Monsanto and Pharmacia claimed in court documents as late as 2006 that "PCBs are not particularly dangerous."

### PCBs IN THE YORKTOWN CENTRAL SCHOOL DISTRICT

49.     The District consists of the following schools: Brookside Elementary School; Crompond Elementary School; French Hill Elementary School; Mohansic Elementary School; Mildred E. Strang Middle School; and Yorktown High School.

---

[1] On December 17, 2003, Solutia and a number of its affiliates and subsidiaries filed for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  Because of the automatic stay arising by virtue of Solutia's bankruptcy filing, and out of an abundance of caution, Solutia is not named as a defendant in this action. Further, all applicable statutes of limitation are automatically tolled pursuant to Section 108 of the Bankruptcy Code.  The District expressly reserves any and all rights to pursue its claims against Solutia.

50.    Upon information and belief, in or around 1969, the French Hill Elementary School ("French Hill") buildings were constructed.

51.    Upon information and belief, the French Hill buildings were built using materials containing PCBs, including, but not limited to, brick mortar caulking, sidewalk mortar caulking and window and door sealant caulking (the "PCB Contaminated Materials").

52.    As a result of the presence of the PCB Contaminated Materials, the soil in and around the French Hill buildings was also contaminated with elevated levels of PCBs (the "PCB Contaminated Soil").

53.    Upon information and belief, Old Monsanto manufactured the PCBs used in the PCB Contaminated Materials.

54.    The federal Toxic Substances Control Act ("TSCA") regulates PCBs and prohibits the use of PCBs in any manner other than in a totally enclosed manner.

55.    The use of PCBs in caulk is not in a totally enclosed manner.

56.    According to a July 26, 2007 EPA letter, "even though this caulk was applied before the regulations were developed, the caulk continues to serve its originally-intended purpose . . .[t]hus the [District] is continuing to make use of the PCB-containing caulk" which, according to EPA, is a violation of TSCA and EPA regulations therefore potentially subjecting the District to EPA enforcement actions.

57.    According to EPA, the continued use or presence of caulk containing PCBs is prohibited by TSCA and EPA regulations and is therefore illegal and must be removed.

58.    Violations of TSCA subject the violator to potential civil and criminal fines. 15 U.S.C. § 2615(b).

French Hill Window Replacement

59.     In or around 2003, the windows in the French Hill Elementary School ("French Hill") buildings were replaced and the window caulking was removed as part of a renovation project.

60.     Upon information and belief, subsequent to the windows being replaced, a Town of Yorktown resident discovered a piece of window caulking on the ground and, without the District's knowledge, submitted the caulking for analysis.

61.     The caulking collected by the Town of Yorktown resident contained 38,000 ppm of PCBs.

62.     Federal regulations prohibit the use of PCB containing materials where the PCB concentrations exceed 50 ppm.

63.     Upon information and belief, the test results were provided to the Westchester County Department of Health ("WCDOH").

64.     On October 8, 2004, WCDOH notified the District that it received a report indicating that there were elevated levels of PCBs in window caulking from French Hill (the "October 8, 2004 WCDOH Letter").

65.     In response to the October 8, 2004 WCDOH Letter, the District properly removed all window caulking that was on the ground outside French Hill and collected its own samples of caulking for testing.

66.     The District sent the caulking to be analyzed by a lab and received the results in January 2005.

67.     The District's test results confirmed that the window caulking from French Hill contained elevated levels of PCBs in violation of federal regulations.

French Hill Soil Tests

68.     Upon information and belief, in or around November 2004, the same individual who had the window caulking tested collected samples from French Hill in the general area where the windows were replaced and sent them for testing.

69.     The test results from these samples contained high levels of PCBs.

70.     Upon information and belief, in January 2005, WCDOH performed an independent soil investigation at French Hill in the area where the windows were replaced.

71.     Upon information and belief, the results from the soil sample indicated PCBs were present in the soil (the PCB Contaminated Soil) at levels significantly above the New York State Department of Environmental Conservation ("NYSDEC") clean up guidance level of one part per million for surface soils.[2]

72.     As a result of this information, the WCDOH directed the District to submit a work plan for the removal of the PCB Contaminated Soil.

73.     On or about August 5, 2005, after having its work plan approved by WCDOH, the District removed and disposed of approximately 591 cubic yards of soil.

74.     PCBs were detected at varying depths in the soil including up to two feet deep.

75.     The District incurred substantial costs in properly remediating and disposing the PCB contaminated Soil in accordance with the WCDOH work plan.

_____

[2]  WCDOH required the District to clean up the soil in accordance with the NYSDEC clean up guidance of one part per million for surface soils.

76.     On or about August 30, 2005, "wipe tests" of the French Hill buildings revealed that there were building surfaces (including, but not limited to, window panes, building sills, doors and masonry expansion caulking) that contained levels of PCBs as high as 22,700 parts per million ("ppm").

77.     Federal regulations prohibit the use of PCB containing materials where the PCB concentrations exceed 50 ppm.

78.     In or around September 2006, EPA informed the District that the presence of PCBs in the French Hill buildings in the PCB Contaminated Materials and surrounding areas (the PCB Contaminated Soil) violates TSCA.

79.     Upon information and belief, the District has removed all of the known PCB Contaminated Materials at French Hill in accordance with all applicable federal, state and local laws and regulations.

80.     The District incurred substantial costs in properly removing the PCB Contaminated Materials.

<u>2007 French Hill PCB Abatement Work</u>

81.     As part of a French Hill construction project during the summer of 2007, testing was performed on the sidewalk expansion joint caulking to determine the presence of PCBs.

82.     As a result of said testing, on or about July 12, 2007, PCB abatement work was performed on the sidewalks at the French Hill campus.

83.     Approximately 180 linear feet of PCB contaminated sidewalk expansion joint caulking was properly removed and disposed of in accordance with all applicable federal, state and local regulations.

84.     In addition, in accordance with all applicable federal, state and local regulations, approximately one foot of concrete on either side of the sidewalk expansion joint caulking was removed to ensure that any concrete that contacted the PCB contaminated caulking was properly removed and disposed.

85.     The District has incurred, and continues to incur, substantial costs removing and disposing the contaminated sidewalk expansion caulking and surrounding concrete.

86.     As a result of the presence of PCBs in the PCB Contaminated Materials, the District's property has been damaged and has caused and may continue to cause the District to incur remediation costs associated with French Hill and its other school buildings.

87.     Upon information and belief, Old Monsanto designed, manufactured, distributed, marketed and/or sold all the PCBs that were used in the construction of the French Hill buildings.

88.     Upon information and belief, Old Monsanto designed, manufactured, distributed, marketed and/or sold all of the PCBs that were potentially used in the construction of additional District buildings and campuses.

89.     Upon information and belief, Pecora Corporation designed, manufactured, distributed, marketed and/or sold the caulking product containing the PCBs which have caused damage to the District.

90.     Upon information and belief, Pecora Corporation designed, manufactured, distributed, marketed and/or sold caulking containing PCBs throughout the United States.

91.     Upon information and belief, the PCB Contaminated Materials contaminated the PCB Contaminated Soil and caused the District's property to be damaged resulting in the District

incurring substantial remediation costs, including, but not limited to, testing, removal and disposal costs.

92.    As a result of Defendants' actions the District has been damaged and may continue to suffer damages in the future.

### IV.    Claims Against Defendants

### FIRST CAUSE OF ACTION
### <u>MISREPRESENTATION AND FRAUDULENT CONCEALMENT</u>

93.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

94.    Defendants knew, during the course of their design, distribution, marketing, and sale of its products that its PCBs and caulk containing PCBs had dangerous product contamination and/or manufacturing defect and/or formulation design defect which could cause severe damages to users of its products and the general public.

95.    Defendants knew that PCBs and caulk containing PCBs were defective and toxic and posed significant danger to individuals coming into contact or exposed to it.

96.    Despite having this knowledge, Old Monsanto continued to manufacture PCBs until 1971.

97.    Despite overwhelming evidence to the contrary, New Monsanto and Pharmacia stated in court documents as late as 2006 that "PCBs are not particularly dangerous."

98.    Defendants admitted that the unique characteristics of PCBs may cause harm.

99.    PCBs and caulk containing PCBs are defectively designed and caused Plaintiff's injuries.

100.    Due to a manufacturing and/or design defect, PCBs and caulk containing PCBs were in a defective condition, unreasonably dangerous to Plaintiff and others at the time the products left Defendants' control.

101.    Upon information and belief, after knowledge that there were serious problems associated with the use of PCBs, Defendants deliberately concealed the problem from Plaintiff and the general public despite having a duty to reveal this material information.

102.    Upon information and belief, Defendants continued to design, manufacture, market, distribute and/or sell PCBs and caulk containing PCBs so as to maximize sales and profits at the expense of the health and safety and property interests of the public, including Plaintiff.

103.    Defendants' misrepresentations and/or omissions regarding the safety of PCBs did not give Plaintiff the opportunity to use other products for caulking purposes.

104.    By reason of the foregoing misrepresentation, Plaintiff was and will be caused property damage and incur economic loss in an amount to be determined at trial.

105.    By reason of the foregoing, Plaintiff is entitled to compensatory and punitive damages.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE AND RECKLESSNESS**

106.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

107.    Defendants owed a duty of reasonable care to Plaintiff to design, manufacture, market, test, and perform quality assurance evaluations, sell and/or distribute PCBs or caulk containing PCBs in a safe condition.

108.    Defendants breached their duty because they failed to exercise reasonable care and/or were reckless in the design, sale, testing, quality assurance, marketing, packaging, warnings, advertising, promotion, monitoring and warning of adverse effects, and/or distribution of PCBs and caulk containing PCBs.

109.    Defendants' conduct was reckless and beyond all standards of common decency so as to permit the recovery of punitive damages.

110.    By reason of the foregoing, Plaintiff was and will be caused damages to its property and incur economic loss in an amount to be determined at trial.

111.    By reason of the foregoing, Plaintiff is entitled to compensatory and punitive damages.

**THIRD CAUSE OF ACTION**
**STRICT PRODUCTS LIABILITY FOR MANUFACTURING DEFECT**

112.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

113.    Plaintiff purchased and used Defendants' caulk containing PCBs.

114.    Defendants allowed PCBs, a known contaminant, to be placed within the product in the manufacturing process.

115.    As a result of the contaminant and/or product defect, the caulking product was in a defective condition and unreasonably dangerous to Plaintiff when it left the Defendants' control.

116.    At all times, Defendants' caulking product containing PCBs was used in the manner intended.

117.    By reason of the foregoing, Plaintiff was and will be caused damages to its property and incur economic loss in an amount to be determined at trial.

118.    By reason of the foregoing, Plaintiff is entitled to compensatory and punitive damages.

## FOURTH CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY – FAILURE TO WARN

119.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

120.    Defendants had a duty to warn Plaintiff and the general public of risks and/or defects about which it knew or should have known with respect to PCBs in general and specifically PCBs in caulking material.

121.    Defendants failed to adequately warn Plaintiff and the general public of the risks of PCBs and of caulk containing PCBs that was used by Plaintiff.

122.    Defendants also failed to effectively warn of dangers inherent with the use of PCBs and caulk containing PCBs due to its defective design, and/or defective manufacturing, and Defendants' misrepresentations and inadequate fact disclosures to the Plaintiff and the general public constituted the product unreasonably dangerous for normal use.

17

123.     The PCBs and PCB contaminated caulk manufactured and/or supplied by Defendants was unreasonably dangerous and defective because the product  was not accompanied by proper warnings to Plaintiff and the general public regarding the product's toxicity.

124.     After Defendants knew or should have known of the risk of injury from PCBs and caulk containing PCBs, they failed to provide adequate warnings to users or consumers of the product and as a direct result thereof, the caulk containing PCBs manufactured and/or supplied by Defendants was defective due to inadequate post-marketing warning and/or instructions.

125.     By reason of the foregoing, Plaintiff was and will be caused damages to its property and incur economic loss in an amount to be determined at trial.

126.     By reason of the foregoing, Plaintiff is entitled to compensatory and punitive damages.

**FIFTH CAUSE OF ACTION**
**STRICT PRODUCTS LIABILITY – DESIGN DEFECT**

127.     Plaintiff incorporates by reference all preceding paragraphs and allegations of this Complaint as though fully set forth herein and further alleges as follows:

128.     At all material times herein, PCBs and caulk containing PCBs manufactured and/or supplied by Defendants were placed into the stream of commerce by Defendants in a defective and/or contaminated and unreasonably dangerous condition in that the known and foreseeable risks associated with the use of this product exceeded the benefits associated with its design or formulation.

129. Alternatively, PCBs and caulk containing PCBs manufactured and/or supplied by Defendants were defective in design and formulation such that when it was placed in the stream of commerce, it was unreasonably dangerous and/or was capable of becoming unreasonably dangerous.

130. PCBs and caulk containing PCBs manufactured by Defendants were defective due to inadequate warnings or instructions since Defendants knew or should have known that the product created a risk of harm to consumers such as Plaintiff when used in the way it was intended to be used and in a manner which was reasonably foreseeable by Defendants.

131. PCBs and caulk containing PCBs manufactured and supplied by Defendants were defective due to inadequate warnings, inadequate testing, inadequate post-marketing warnings, inadequate post-marketing instructions, because after Defendants knew or should have known of the risk of injury from PCBs and caulking containing PCBs, they failed to provide adequate warnings to users or consumers of the product and failed to immediately address the threat their PCBs and caulk containing PCBs posed to Plaintiff and the public.

132. PCBs and caulking containing PCBs were at the time they left Defendants' control, defective products, unreasonably dangerous for use, resulting in injury to Plaintiff as herein alleged.

133. The defective and unreasonably dangerous condition of PCBs and caulking containing PCBs was the proximate cause of the damages and injuries sustained by Plaintiff.

134. By reason of the foregoing, Plaintiff was and will be caused damages to its property and incur economic loss in an amount to be determined at trial.

135.    By reason of the foregoing, Plaintiff is entitled to compensatory and punitive damages.

## SIXTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

136.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

137.    Defendants expressly warranted that caulking containing PCBs was safe for its intended use.

138.    Plaintiff reasonably relied on the express warranty that caulking containing PCBs was in a safe condition and that reliance formed the basis of the bargain.

139.    Caulking containing PCBs was not safe for its intended use in that it was defective and Defendants therefore breached their express warranty.

140.    By reason of the foregoing, Plaintiff was and will be caused damages to its property and incur economic loss in an amount to be determined at trial.

141.    By reason of the foregoing, Plaintiff is entitled to compensatory and punitive damages.

## SEVENTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF FITNESS

142.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

143.    Defendants impliedly warranted that they would sell and deliver PCBs and caulk containing PCBs in a condition that was fit for the particular purposes for which it was intended.

20

144.    Defendants knew that Plaintiff intended to use caulk containing PCBs for the particular purpose of a sealing material in schools and other buildings.

145.    Plaintiff relied upon Defendants' skill and/or judgment in their ability to furnish suitable caulking material that was safe.

146.    The caulk containing PCBs was not safe for its intended use in that it was defective and Defendants therefore breached their express warranty.

147.    Defendants, by selling and delivering a defective and unsafe caulking product to Plaintiff, breached the implied warranty of fitness for a particular purpose, in that the caulk containing PCBs was defective and/or contaminated.

148.    By reason of the foregoing, Plaintiff was and will be caused damages to its property and incur economic loss in an amount to be determined at trial.

149.    By reason of the foregoing, Plaintiff is entitled to compensatory and punitive damages.

## EIGHTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTIBILITY

150.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

151.    Defendants impliedly warranted that PCBs and caulk containing PCBs were in a condition and of a quality that would pass as merchantable.

152.    PCBs and caulk containing PCBs were not merchantable, as they were defective in that they were not fit for the ordinary purpose for which they were intended.

153.    By reason of the foregoing, Plaintiff was and will be caused damages to its property and incur economic loss in an amount to be determined at trial.

154.    By reason of the forgoing, Plaintiff is entitled to compensatory and punitive damages.

### NINTH CAUSE OF ACTION
### VIOLATIONS OF NEW YORK'S GENERAL BUSINESS LAW

155.    Plaintiff incorporates by reference all preceding paragraphs and allegations of this Complaint as though fully set forth herein.

156.    Defendants are or were in the business of providing PCBs and materials containing PCBs to consumers in the State of New York, including Plaintiff.

157.    Defendants knew, or in the exercise of reasonable care, should have known that PCBs and caulk containing PCBs were not reasonably safe as designed, manufactured, tested, marketed, distributed and/or sold.

158.    Defendants knew that PCBs and caulk containing PCBs carried the risk of serious health and property risks to its intended users, including the Plaintiff herein.

159.    The Defendants' acts, representations and/or omissions constitute unconscionable commercial practices in connection with the sale of merchandise and false advertising and were deceptive and misleading practices within the meaning of New York's Consumer Protection from Deceptive Acts and Practices Act, General Business Law §§ 349 and 350.

160.    By reason of the foregoing, Plaintiff was and will be caused damages to its property and incur economic loss in an amount to be determined at trial.

161.    By reason of the foregoing, Plaintiff is entitled to damages and attorneys' fees as permitted by the General Business Law.

162.    Plaintiff seeks all available damages as a result of the above conduct by Defendants, including but not limited to those set forth below.

163.    As a result of Defendants' conduct, Plaintiff was forced to remove PCB contaminated caulking from its French Hill School facilities at great expense to Plaintiff.

164.    Plaintiff was required to ship all PCB contaminated materials to an approved hazardous waste landfill at great expense and incurred significant legal expenses in the process.

165.    Plaintiff also seeks an award of punitive or exemplary damages against Defendants.  Defendants engaged in willful, wanton, malicious, reckless and/or grossly negligent conduct in disregard for the safety of Plaintiff and its teachers and students by supplying PCB contaminated caulking to the District and not warning the District that its product contained a hazardous substance.

166.    Defendants are also liable for costs and prejudgment and postjudgment interest as provided by law.

## TENTH CAUSE OF ACTION
## DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201

167.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

168.    Old Monsanto was the sole manufacturer of the PCBs in the United States.

169.    Upon information and belief, in the 1970's the federal government determined that there was a reasonable basis to conclude that the manufacturing, processing, distribution in

commerce, use, or disposal of PCBs, or a combination of such activities, presents an unreasonable risk of injury to health and the environment.

170.     Under TSCA - 15 U.S.C. § 2605(e) "Polychlorinated biphenyls," it is illegal for a person to use PCBs.  None of the few exceptions contained in 15 U.S.C. § 2605(e) apply in the instant case.

171.     PCBs were present in and around the French Hill buildings.

172.     PCBs may be present in and around additional District-owned buildings.

173.     The EPA has determined that the District is in violation of TSCA because of the presence of PCBs in and around French Hill.

174.     As a result of the federal government's prohibition on the use of PCBs in caulk, the District tested, removed and disposed of the PCB Contaminated Material and the PCB Contaminated Soil in and around the French Hill buildings in accordance with all local, state and federal regulations.

175.     The District incurred substantial costs testing, removing and disposing of the PCB Contaminated Material and PCB Contaminated Soil.

176.     As a result of the PCB Contaminated Materials and the PCB Contaminated Soil, the District and the District's property has been damaged.

177.     As a result of the foregoing, pursuant to 28 U.S.C. § 2201, the District is entitled to a declaratory judgment declaring that Defendants are responsible for and shall indemnify the District for the costs of investigation, remediation and other damages and expenses, including attorneys fees, related to the PCB Contaminated Materials and the PCB Contaminated Soil at the District's buildings.

178.    As a result of the foregoing, pursuant to 28 U.S.C. § 2201, the District is entitled to a declaratory judgment declaring that Defendants are responsible for and shall indemnify the District for any potential costs and expenses, including attorneys fees, of investigation, remediation and other damages related to any PCB contamination.

179.    As a result of the foregoing, pursuant to 28 U.S.C. § 2201, the District is entitled to a declaratory judgment declaring that Defendants are responsible for and shall indemnify the District for any costs and expenses, including attorneys fees, associated with any actions brought against the District by past and current students, teachers and employees of the District as well as any other persons.

## IV.    Jury Demand

180.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

WHEREFORE, Plaintiff Yorktown Central School District respectfully requests that Defendants be cited to appear and answer, and that upon final hearing, Plaintiff recover all available damages, interest, and costs and all other relief to which it is justly and properly entitled.

Dated:  October 5, 2007.

Respectfully submitted,

KENNEDY & MADONNA, LLP

_____

Kevin J. Madonna (KM 5595)
Robert F. Kennedy, Jr. (RK 5906)
48 Dewitt Mills Road
Hurley, New York 12443
Telephone:    845-331-7514
Facsimile:    845-230-3111
kmadonna@kennedymadonna.com