UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x

YORKTOWN CENTRAL
SCHOOL DISTRICT,                                    Civil Action No. 07-CIV-8648
                                                   (SCR)

              Plaintiff,

              vs.                                          ECF CASE

MONSANTO COMPANY,
PHARMACIA CORPORATION,
PECORA CORPORATION AND
JOHN DOES 1-20.

              Defendants.

--------------------------------------------------------x

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MONSANTO COMPANY, PHARMACIA
CORPORATION AND PECORA CORPORATION MOTION TO DISMISS**

---

Kevin J. Madonna (KM-5595)
Robert F. Kennedy, Jr. (RK-5906)
Kennedy & Madonna, LLP
48 Dewitt Mills Road
Hurley, New York 12443
845-331-7514
kmadonna@kennedymadonna.com
*Attorneys for Plaintiff Yorktown School
District*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**

**PRELIMINARY STATEMENT**

**STATEMENT OF FACTS**

**STANDARD FOR MOTION TO DISMISS**

**LEGAL ARGUMENT**

**POINT I**

**I.    THE DISTRICT'S FIRST THROUGH NINTH CAUSES OF ACTION ARE
       NOT TIME BARRED AS A MATTER OF LAW**

      **A.    Misrepresentation and Fraudulent Concealment**
      **B.    Negligence/Recklessness and Strict Liability**
      **C.    Breach of Warranty**
      **D.    General Business Law**

**POINT II**

**II.    THE DISTRCIT HAS PROPERLY PLEAD EACH OF ITS CAUSES OF
        ACTION**

      **A.    Misrepresentation and Fraudulent Concealment**
      **B.    Negligence and Recklessness**
      **C.    Strict Products Liability - Manufacturing Defect**
      **D.    Strict Products Liability - Failure to Warn**
      **E.    Strict Products Liability - Design Defect**
      **F.    Breach of Express Warranty**
      **G.    General Business Law**
      **H.    Declaratory Judgment**
      **I.    Punitive Damages**

**POINT III**

**III.    THE DISTRICT CAN RECOVER PROPERTY DAMAGE FOR THE
         CONTAMINATION OF ITS BUILDINGS AND PROPERTY WITH PCBS**

**CONCLUSION**

## **TABLE OF AUTHORITIES**

### **Case Law**

Abbatiello v. Monsanto Co.,
    No. 06 CV 0266 (KWM), 2006 WL 1132289 (S.D.N.Y. Mar. 20, 2006)………...6

Ayala v. V & O Press Co.,
    512 N.Y.S.2d 704, 707 (2nd Dept. 1987)……...……….………………………...17

Brumbaugh v. CEJJ, Inc.,
    547 N.Y.S.2d 699, 701 (2nd Dept. 1989)………...………………….....…………17

Butler v. Interlake Corp.,
    665 N.Y.S.2d 192 (4th Dep't 1997)……………………………………………13, 14

Commonwealth of Penn. v. U.S. Mineral Prods. Co.,
    927 A.2d 717, 725 (Pa. Commw. Ct. 2007)………………………………………6

Foley v. D'Agastino,
    248 N.Y.S.2d 121, 126 (1st Dep't 1964)……...……………….…...…………...23

Frederick v. Niagara Machine & Tool Works,
    486 N.Y.S.2d 564, 565 (4th Dep't 1985)……………………………...………15

Friedl v. City of New York,
    210 F.3d 79, 83 (2d Cir. 2000)……...……………………………………….7

Genesco Entertainment v. Koch,
    593 F. Supp. 743, 751 (S.D.N.Y. 1984)……………………………...…………...20

Germantown Cent. Sch. Dist. v. Clark, Clark, Millis & Gilson, AIA,
    791 N.E.2d 398, 401 (N.Y. 2003)……………………………………………..9, 10

Giblin v. Murphy,
    532 N.E.2d 1282 (N.Y. 1988)……………………...………………………….....22

Gray v. Rochester Gas & Elec. Corp.,
    468 N.Y.S.2d 791 (4th Dep't 1983)…………...…...……………………....24

Harris v. City of New York,
    186 F.3d 243, 247 (2d Cir. 1999)…………...…..……………………………..8

Icelandic Airlines, Inc. (Loftleidir) v. Canadair, Ltd.,
    428 N.Y.S.2d 393, 398-99 (N.Y. Sup. Ct. 1980)……………………………...…17

In re: MTBE Prods. Liab. Litig.,
        175 F.Supp.2d 593, 630-31 (S.D.N.Y. 2001)……………...…………….20, 21

Jensen v. General Elec. Co.,
        623 N.E.2d 547, 549 (N.Y. 1993)……………………………………………8

Jiminez v. Dreis & Krump Mfg. Co.,
        736 F.2d 51, 55 (2d Cir. 1984)…………….…………………………….13

Karlin v. IVF Am., Inc.,
        712 N.E.2d 662, 665 (N.Y. 1999)…………….…………………….………20

Leary ex rel. Debold v. Syracuse Model Neighborhood Corp.,
        799 N.Y.S.2d 867, 874 (N.Y. Sup. Ct. 2005)……………..……………….15, 18

Liriano v. Hobart Corp.,
        700 N.E.2d 303, 305 (N.Y. 1998)…………………………………………13

McLaughlin v. Mine Safety Appliances Co.,
        181 N.E.2d 430, 433 (N.Y. 1962)……...…………………………….……..13

MRI Broadway Rentals, Inc. v. U.S. Mineral Prods. Co.,
        704 N.E.2d 550 (N.Y. 1998)………………………………………...…11

Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank,
        647 N.E.2d 741, 744 (N.Y. 1995)…………………………………….......12, 19

Sims v. Artuz,
        230 F.3d 14, 20 (2d Cir. 2000)…..……………………………..…………7

Stutman v. Chemical Bank,
        731 N.E.2d 608, 612 (N.Y. 2000)………...…………………………….....21

Transwestern Pipeline v. Monsanto Co.,
        46 Cal. App. 4th 502, 528 n.9 (Cal. Ct. App. 2nd Dist. 1996)………..…….11, 15

**Court Rules/Statutes**

Fed. R. Civ. P. 12(b)(6)……………………...……………………………..7

N.Y. C.P.L.R. § 201………………………………………...…………………..8

N.Y. C.P.L.R. § 214-c…...………………………………………...………..…8

N.Y. Gen. Bus. Law § 349……...………………………………...……….…12, 19

## PRELIMINARY STATEMENT

Plaintiff, Yorktown School District ("District" or "Plaintiff"), respectfully submits this Memorandum of Law in Opposition to Defendants' Monsanto Company and Pharmacia Corporation (collectively "Monsanto") Motion to Dismiss Complaint ("Defs' Mem.") and Pecora Corporation's (Pecora) Motion to Dismiss Complaint. Pecora has joined and incorporated all arguments set forth by Monsanto into Pecora's motion. The District, therefore, has filed one joint response to both motions since all Defendants' arguments are virtually identical. To the extent that Pecora has advanced an argument not made by Monsanto, the District has responded accordingly within this memorandum by specifically citing to Pecora's motion.

Monsanto urges this Court to dismiss the District's Complaint ("Complaint") in its entirety because, according to Monsanto, it is time-barred and/or does not properly plead basic elements of its causes of action. Defs' Mem. at 1. However, as the arguments below demonstrate, the District's Complaint is not time-barred and clearly alleges viable causes of action under New York law to which Monsanto should be made to respond. The District has also filed an Amended Complaint ("Amended Compl.") which is attached hereto as Exhibit 1. Although the District's position is that its existing Complaint, as plead, is sufficient, the District filed the attached Amended Complaint in light of the arguments raised by Defendants.

This case involves the contamination of the French Hill Elementary School with polychlorinated biphenyls ("PCBs"), a known carcinogen. The French Hill Elementary School provides a learning environment for 440 students and a working environment for 84 teachers and support staff. As a result of Monsanto's conduct, toxic PCBs were found

in caulking materials, which have contaminated surrounding masonry, windowsills and soil at the French Hill School, thereby threatening the health of the District's students and teachers and causing the District great expense to remediate its property. This situation is not unique to the District. Monsanto's PCBs have been found in at least one dozen other schools and universities throughout the northeast causing the affected schools and universities to spend millions of dollars in remediation costs. <u>See</u> http://www.pcbinschools.org.

A review of the history surrounding PCBs reveals that Monsanto introduced PCBs into the marketplace with full knowledge of the chemical's toxic characteristics. Despite this knowledge, Monsanto chose to mislead the American public with fraudulent claims that PCBs were not a threat to public health or the environment and asserted, instead, that PCBs had a "miracle"-like utility. <u>Commonwealth of Penn. v. U.S. Mineral Prods. Co.</u>, 927 A.2d 717, 725 (Pa. Commw. Ct. 2007) (citation omitted). In fact, as late as 2006, Monsanto still takes the shameless position that PCBs are not particularly dangerous. In court documents, Monsanto stated that "[t]he public perception of PCBs, fueled by decades of propaganda, is that they are extremely dangerous to people's health. The truth is that PCBs are not particularly dangerous." Mem. in Opp. to Plaintiffs' Motion to Remand, <u>Abbatiello v. Monsanto Co.</u>, No. 06 CV 0266 (KWM), 2006 WL 1132289 (S.D.N.Y. Mar. 20, 2006).

As the District's Complaint demonstrates, however, Monsanto is, and was at all times relevant, well aware of the toxic characteristics of PCBs and the likelihood of its toxic product causing significant damage to persons and property, yet did nothing to mitigate this danger or warn distributors, government officials, the public or the District –

all in the interest of generating profits.  Monsanto now takes the position that the District is responsible for *all* the damages its has sustained as a result of Monsanto's toxic product.  The District has already spent hundreds of thousands of dollars remediating Monsanto's PCBs, funds which were taken *directly* out of its facilities budget and therefore can not be spent on other projects to benefit its students.

## STATEMENT OF FACTS

The factual allegations relevant to this motion are set forth in the District's Complaint which is appended to Defs' Mem. as Exhibit 1 and incorporated herein by reference.  Additional factual allegations are set forth in Plaintiff's First Amended Complaint which is appended to the District's Memorandum of Law in Opposition to Defendants' Motion to Dismiss as Exhibit 1.

## STANDARD FOR MOTION TO DISMISS

When ruling on a Rule 12(b)(6) motion, a court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor. Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000).  At the Rule 12(b)(6) stage, "[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.  Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test." Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000) (citation omitted).  A court's task is to "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."  Sims, 230 F.3d at 20 (citation omitted).  Dismissal of a complaint pursuant to Rule 12(b)(6) is proper only where "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."  Harris v. City of New York, 186 F.3d 243, 247 (2d Cir. 1999).

## LEGAL ARGUMENT

### POINT I

I.    **PLAINTIFF'S CAUSES OF ACTIONS ARE NOT TIME BARRED AS A MATTER OF LAW**

    A.    **Misrepresentation and Fraudulent Concealment**

As reflected in its First Amended Complaint, the District has withdrawn its misrepresentation and fraudulent concealment causes of action against all Defendants.

    B.    **Negligence/Recklessness and Strict Liability**

Monsanto argues that the District's negligence/recklessness and strict liability claims are time-barred and should be dismissed. Defs' Mem. at 6-8.  Monsanto's arguments are without merit and should be denied.  Under New York law, the District's claims are tolled by the discovery rule applicable to property damage caused by exposure to toxic substances.  N.Y. C.P.L.R. §§ 201, 214-c.  Section 214-c applies to actions for "damages for injury to property caused by the latent effect of exposure to any substance." Id.  As the court noted in Jensen v. General Elec. Co., 623 N.E.2d 547, 549 (N.Y. 1993), "[t]he all-encompassing sweep of the aforementioned words "chosen by the legislature" leaves no room for judicial insertion, qualification or exception . . . ." (citations omitted). The statute was enacted to "provide relief to injured New Yorkers whose claims would otherwise be dismissed for untimeliness simply because they were unaware of the latent injuries until after the limitation period had expired." Id.

Monsanto argues that § 214-c does not apply to the District's claim because it "does not apply to property damage claims solely for the abatement of the defective product itself." Defs' Mem. at 7. This argument is based on a fundamental misunderstanding of § 214-c and the facts and claims presented in the District's Complaint. The District is not suing to recover damages "solely" for the abatement costs associated with caulking containing PCBs. Rather, the District is suing to recover damages associated with contamination caused by the PCB-containing caulking, in addition to costs associated with removing PCB-containing caulking that occurred after the 2003 renovation. Compl. ¶¶ 65, 73-76, 79, 82-85. Even if this Court finds that abatement costs are not covered under § 214-c, which the District disputes, then the other costs associated with remediating the school property clearly falls within § 214-c, as admitted by Monsanto when it **argued** that § 214-c applies to "property damage caused by the toxic substance above and beyond the substance's mere presence in the building." Defs' Mem. at 7.

Monsanto relies on Germantown Cent. Sch. Dist. v. Clark, Clark, Millis & Gilson, AIA, 791 N.E.2d 398, 401 (N.Y. 2003) in support of its contention that the District's claims are time barred as a matter of law. The District does not dispute Monsanto's interpretation of the holding of Germantown, but rather, its application of the case to the facts in the instant case. The facts, as plead by the District, fit squarely within the tolling protection of § 214-c, as articulated by Germantown, and quoted by Monsanto:

> Although the statute embraces an "injury to property," there is no allegation by plaintiff that the asbestos migrated to a different location, became airborne or friable, or caused illness to any occupants of the building. Where, as here, plaintiff's property damage claim involves no additional damage to its building since the original implantation of the harmful substance – or stated another way, where the passage of time has

> produced no change in the consequences of the presence of asbestos – the injury cannot be said to have resulted from the latent effects of exposure to a toxic substance.  Plaintiff's situation is not analogous to hazardous waste or chemical spill contamination cases where the property damage results from the seepage or infiltration of a toxic foreign substance over time.  Here the harm to plaintiff's property occurred upon installation of the asbestos in the building and was constant thereafter.

Id. (citations omitted).

Relying on Germantown, Monsanto contends that the District's claims do not fit within § 214-c because "[t]he District [has] not alleg[ed] that the passage of time has produced any change in consequences of the presence of PCBs in the French Hill school buildings, i.e., the District does not allege that PCBs migrated from the caulking materials . . . ."  Defs' Mem. at 8.  In fact, Monsanto's argument is directly contradicted by the District's Complaint.  As part of its Complaint, the District alleges that "[a]s a result of a presence of the PCB Contaminated Materials, the soil in and around the French Hill buildings was also contaminated with elevated levels of PCBs . . . ." Compl. ¶ 52; see also Amended Compl. ¶¶ 20, 21, 59.

The District has also discovered that the PCBs in the caulking have migrated from sidewalk expansion joints into the concrete adjacent to the joints, requiring the District to remove six-inches of concrete on each side of the joint.  Compl. ¶ 81-86.  Scientific studies have revealed that PCBs migrate from caulking into surrounding soils, concrete and masonry surfaces.  Amend. Compl. ¶¶ 20-21.  Accordingly, the passage of time since the PCB caulking was installed has produced a "change in the consequence of" PCBs, and therefore the District's injury can "be said to have resulted from the latent effects of the exposure to a toxic substance." Germantown, 791 N.E.2d at 401 (citations omitted).

This is *exactly* the type of situation that § 214-c was designed to protect and it is the *exact* situation contemplated by the Court of Appeals in Germantown.

This distinction is equally applicable to the rationale of the Court of Appeals decision in MRI Broadway Rentals, Inc. v. U.S. Mineral Prods. Co., 704 N.E.2d 550 (N.Y. 1998) denying the applicability of § 214-c because the plaintiff's claims related "simply to the presence of asbestos in the building." Id. at 554.  The court's decision was also based upon specific findings of fact demonstrating that the plaintiff had long been aware of the presence and associated dangers of asbestos in its building as well as a "growing general awareness that many New York City office buildings had asbestos problems." Id. at 551.  This is a far cry from the facts in the instant case.  Here, the District first learned of the presence of PCBs in its building on October 8, 2004, and filed its suit within the three year period.  There is nothing to suggest that there exists or that the District benefited from a "growing general awareness that many New York [schools] had [PCB] problems," nor is there anything to suggest that the District learned of the PCBs on their property prior to October 8, 2004. Id.   Furthermore, as Monsanto argued in a previous case where a jury found it liable for PCB contamination under negligent failure to warn and strict liability design defect theories, asbestos cases must be cited with caution because they are "unique in the law." Transwestern Pipeline v. Monsanto Co., 46 Cal. App. 4th 502, 528 n.9 (Cal. Ct. App. 2nd Dist. 1996).

Accordingly, Plaintiff's negligence/recklessness and strict liability property damage claims are not time barred and the Defendants' motion to dismiss should be denied.

### C.    Breach of Warranty

As reflected in its First Amended Complaint, the District has withdrawn its Breach of Warranty causes of action against all Defendants.

### D.    General Business Law

Monsanto argues that the District's New York General Business Law ("GBL") claim is time barred because, according to Monsanto, the District suffered its injury in 1969 when PCB caulking was installed. Defs' Mem. at 9. Monsanto's argument is without merit and should be rejected.

To state a claim under GBL section 349 "a plaintiff must allege that the defendant has engaged "in an act or practice that is deceptive or misleading in a material way *and* that the plaintiff has been injured by reason thereof." Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, 647 N.E.2d 741, 744 (N.Y. 1995) (emphasis added). Although the District alleges fraudulent conduct on behalf of Monsanto dating back to the 1930s, the District did not suffer injury to its property until it incurred damages as a result of PCB contamination in October of 2004. Once again, the District is not suing for pure abatement costs. The District is primarily suing to recover damages related to remediating PCB contaminated soils and materials from its property. According to Monsanto, the District was required to file suit by 1972 even though it had not incurred damages. This was obviously legally and factually impossible since the District had not incurred any damages in 1972. Monsanto's argument defies logic and should be rejected.

# POINT II

**II.    THE DISTRICT HAS PROPERLY PLEAD EACH OF ITS CAUSES OF ACTION**

### A.    <u>Misrepresentation and Fraudulent Concealment</u>

As reflected in its First Amended Complaint, the District has withdrawn its misrepresentation and fraudulent concealment causes of action against all Defendants.

### B.    <u>Negligence and Recklessness</u>

Monsanto contends that the District's negligent failure to warn claim should be dismissed because Monsanto owed no duty to the District.  It is black-letter law in New York that "a manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its products of which it knew or should have known." <u>Liriano v. Hobart Corp.</u>, 700 N.E.2d 303, 305 (N.Y. 1998) (citation omitted).  This duty to warn extends to "third persons exposed to a foreseeable and unreasonable risk of harm by the failure to warn." <u>McLaughlin v. Mine Safety Appliances Co.</u>, 181 N.E.2d 430, 433 (N.Y. 1962) (citation omitted).  Where the danger may not be obvious as a matter of law, as in this case, and may depend on disputed facts, the issue is also fit for a jury to determine, and not appropriate for resolution on a motion to dismiss. <u>Jiminez v. Dreis & Krump Mfg. Co.</u>, 736 F.2d 51, 55 (2d Cir. 1984) (applying New York law).

For support, Monsanto cites to <u>Butler v. Interlake Corp.</u>, 665 N.Y.S.2d 192 (4th Dep't 1997), for the proposition that New York law imposes no duty on a manufacturer of a component material to discover exactly how the completed product will be used. <u>Butler</u> is an exception to the above stated black-letter law - a fact-based exception that is inapplicable to the facts of the District's case.  Monsanto's reliance on <u>Butler</u> is

misguided and ignores the weight of authority imposing a duty on component manufacturers.

In Butler, the court determined that a component part manufacturer has no duty to discover the *exact* uses of its component parts. This decision was based upon the unique set of facts in that specific case and was not intended to be applied generally, as it is being offered by Monsanto. While restating the general rule that "a manufacturer ordinarily is in the best position to know the dangers inherent in its product and determine which safety features should be employed," the Butler Court recognized an exception "when potential dangers vary according to the use of a product." Id. at 914 (citation omitted). The court chose to apply the exception because the "[defendant] established that it generally does not know for what specific purpose its component parts have been ordered, and plaintiffs offered no proof to the contrary." Id. (citations omitted). There has been no similar showing here by Monsanto disavowing knowledge of its product's end-use. However, upon the District's information and belief, Monsanto is, and was, at all times relevant, aware that its PCBs were being used as a component part in caulking products.

Monsanto further argues that the District's negligent failure-to-warn theory should be dismissed because the District has not plead how warnings would have remedied the defect. Defs' Mem. at 13. This statement is contrary to the District's complaint as well as Monsanto's own motion. The concise answer to the question posed by Monsanto is that the District simply would not have purchased or allowed the use of a product containing Monsanto's toxic PCBs on its property had it been adequately informed and warned of the dangers and risks associated with the product. Contrary to

Monsanto's motion, this alternative/remedy is adequately plead in the District's complaint.  See Compl. ¶ 103.[1]  The Defendants are similarly mistaken in their argument that the District's complaint does not establish any facts that PCBs were unreasonably dangerous.  See Compl. ¶¶ 23-29, 31-33; see also Transwestern Pipeline v. Monsanto Co., 46 Cal. App. 4th 502, 510 (Cal. Ct. App. 2nd Dist. 1996) (jury verdict finding Monsanto liable for PCB contamination under negligent failure to warn and strict liability design defect theories).

Monsanto and Pecora also incorrectly argue that the District has the burden of articulating what warning should have been given regarding the danger of its PCBs.  Defs' Mem. at 13; Pecora's Mem. at 7-8.  A plaintiff does not, however, have the burden of postulating exactly how a defendant should have accomplished this task, only that it failed to do so and that the plaintiff has been injured as a result.  Frederick v. Niagara Machine & Tool Works, 486 N.Y.S.2d 564, 565 (4th Dep't 1985) (the type of notice required under the circumstances, the obviousness of the danger and the extent of plaintiff's knowledge of the danger are issues appropriate for resolution by a jury) (citation omitted).

Similarly, Monsanto argues that no warning, either at time of sale or post sale bears any causal relationship to the District's damages.  Implicated in this argument is the issue of proximate cause.  The question of whether the failure to warn proximately caused a plaintiff's injury is a factual dispute for the jury to decide. See Leary ex rel. Debold v. Syracuse Model Neighborhood Corp., 799 N.Y.S.2d 867, 874 (N.Y. Sup. Ct. 2005) (the existence and scope of post sale duty to warn are fact specific).

---

[1]  Interestingly, Defendants previously cited to this specific paragraph of the complaint in their memorandum of law in support of their motion to dismiss. See Defs' Mem. at 10.

Monsanto further urges this court to dismiss the District's negligence and recklessness design defect claims because, according to Monsanto, the District has "not alleged any facts regarding the feasibility of a safer alternative design . . . ." Defs' Mem. at 12. If a defect indeed exists in the District's Complaint, it has been cured in its First Amended Complaint where the District alleges that at all times there was a feasible and safer alternative design for Monsanto's PCBs, namely designing its product so that its toxic chemicals would not escape through mobilization and/or volatization thereby contaminating indoor air, buildings and properties. Amended Compl. ¶ 130. The District also alleges that Pecora could have designed its caulking product to prevent the migration of PCBs into the surrounding environment or designed its product without the inclusion of PCBs. Id.

The District contends that its Complaint sufficiently alleges the elements of its cause of action and the damages proximately flowing from Monsanto's negligence. Since, however, Monsanto's motion to dismiss calls for more specific allegations, the District has cured any deficiency by its attached Amended Complaint.

### C.    <u>Strict Products Liability – Manufacturing Defect</u>

According to Monsanto, to survive a motion to dismiss on a strict liability manufacturing defect claim, a plaintiff must plead that "(1) when the product left the defendant's control, it deviated in a material way from its design or performance standards; and (2) the defect was a substantial factor in causing the injury." Defs'. Mem. at 13-14. Assuming Monsanto's reading of the law is accurate, the District has clearly met its burden and Monsanto's suggestion otherwise is wrong and should be rejected.

The District, in its First Amended Complaint, claims that when Defendants' products left their control, the products contained a manufacturing defect which enabled PCB molecules to escape into the environment, thus contaminating the District's property. Amended Compl. ¶¶ 20, 21, 113. If PCBs in a volatile form were not included in the caulking product at issue, the caulk would have served its intended purpose without damaging the District.

### D.     Strict Products Liability – Failure to Warn

Monsanto maintains that the duty of a manufacturer of a component part has never been recognized under New York law. Defs' Mem. at 15. The absence of support for this point is telling. "New York recognizes that a component part manufacturer is exposed to liability where it supplies a defective part which causes an accident. Liability is recognized either under a negligence theory or under a theory of strict products liability." Ayala v. V & O Press Co., 512 N.Y.S.2d 704, 707 (2nd Dept. 1987) (citations omitted); see also Brumbaugh v. CEJJ, Inc., 547 N.Y.S.2d 699, 701 (2nd Dept. 1989) ("potential defendants [in a strict products liability case] has been judicially expanded to include distributors, retailers, processors of materials and makers of component parts, or essentially to any one responsible for placing the defective product in the marketplace.") (citations omitted); Icelandic Airlines, Inc. v. Canadair, Ltd., 428 N.Y.S.2d 393, 398-99 (N.Y. Sup. Ct. 1980) (holding that actions in negligence could be instituted against the manufacturer of a component part).

Monsanto again argues that even if its duty to warn extended to the District, the claim should fail because the District has not alleged any causal connection between a

failure to warn and the District's injury.  This argument should fail for the very same reasons it should fail in the context of the District's negligence failure to warn theory. First, the nexus between Monsanto's failure to warn and the alleged injury is properly alleged in the complaint. Compl. ¶ 103.  Second, the question of whether the failure to warn proximately caused the Plaintiff's injury is a factual dispute for the jury to decide. See Leary ex rel. Debold v. Syracuse Model Neighborhood Corp., 799 N.Y.S.2d 867, 874 (N.Y. Sup. Ct. 2005) (the existence and scope of post sale duty to warn are fact specific).

Pecora's strict liability failure to warn argument is addressed in section II(B), supra.

### E.    Strict Products Liability – Design Defect

Monsanto contends that the District's strict products liability design defect claim should fail because, according to Monsanto, it does not adequately allege any facts regarding the feasibility of a safer alternative design.  Defs' Mem. at 16.  The District contends that the complaint sufficiently alleges the elements of its cause of action; however, since Monsanto has filed a motion to dismiss calling for more specific allegations, the District has cured any potential deficiencies by filing an Amended Complaint.  See Amended Compl. ¶¶ 124-34.  At all times a feasible safer alternative design existed for Defendants' products.  Monsanto should have manufactured its product without the mobility characteristics described in the District's complaint and Pecora should have designed its product to minimize or eliminate the escape of PCBs into the environment.  Id. ¶ 130.

### F.  **Breach of Warranty Claims**

The District is not pursuing it Breach of Warranty cause of action against Defendants.

### G.  **General Business Law**

Monsanto's argument that the District has failed to state a cause of action under General Business Law ("GBL") section 349 must fail.  Section 349 states, in relevant part:

> (a)    Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.
> . . .
>
> (g)    This section shall apply to all deceptive acts or practices declared to be unlawful, whether or not subject to any other law of this state
>
> (h)    [A]ny person who has been injured by reason of any violations of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions.
>
> GBL §§ 349 (a), (g) & (h).

To state a claim under GBL section 349 "a plaintiff must allege that the defendant has engaged "in an act or practice that is deceptive or misleading in a material way and that the plaintiff has been injured by reason thereof."  <u>Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank</u>, 647 N.E.2d 741, 744 (N.Y. 1995).  Enacted in 1970, GBL § 349 was a legislative response to the inadequate remedies available to injured consumers under common law.  The statute's broad language "was intended to provide a 'strong deterrent against deceptive practices' and to 'increase the effectiveness

of the consumer protection laws.'"  Genesco Entertainment v. Koch, 593 F. Supp. 743, 751 (S.D.N.Y. 1984) (citations omitted).  Section 349 is a broad, remedial statute whose purpose is to protect the public from conduct affecting the public interest.  In re: MTBE Prods. Liab. Litig., 175 F.Supp.2d 593, 630-31 (S.D.N.Y. 2001).  Consumer protection statutes such as GBL § 349 "provide needed authority to cope with the numerous, ever changing types of false and deceptive business practices which plague consumers in [New York]."  Karlin v. IVF Am., Inc., 712 N.E.2d 662, 665 (N.Y. 1999) (citation omitted).

Monsanto argues that the District's § 349 claim must be dismissed because (1) Monsanto's deceptive practices was not sufficiently "consumer oriented", (2) the District did not have a contract with Monsanto, and (3) the District has not identified any misleading or deceiving advertisements by Monsanto.  Defs' Mem. at 18-20.  As discussed below, the District's Complaint has clearly plead a violation of § 349 and Monsanto's argument to the contrary should be rejected.

Monsanto's conduct is sufficiently consumer-oriented to state a claim under § 349.  Although typical § 349 cases generally involve claims arising from commercial transactions, "neither the text of the statute nor the case law establishes this requirement." In re: MTBE, 175 F.Supp.2d at 630-31.  "The critical question [under section 349] is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer or a competitor."  Id. at 631 (quoting Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995), cert denied, 516 U.S. 1114 (1996) (action brought by competitor)).

Although the District does not allege that its injuries were directly caused by a

specific commercial transaction, it has alleged that Monsanto is engaged in the business of providing PCBs to consumers, *including plaintiffs,* in the State of New York (Complaint ¶ 156); that Monsanto was aware that PCBs were escaping into the environment (Complaint ¶¶ 26, 29, 31); that Monsanto was aware that PCBs had contaminated communities in the United States, *id.* ¶¶ 34, 47; that Monsanto was aware of hazards associated with PCBs but sought to suppress them, id. ¶¶ 32, 33, 36; and that despite this knowledge, Monsanto mislead the public in order to continue the sale of its toxic product.  Id. ¶¶ 28-30.  "This alleged conduct affects the public interest in New York and is sufficiently consumer-oriented to state a claim under the statute."  In re: MTBE, 175 F.Supp.2d at 631.

Monsanto's claim that the District's GBL § 349 must fail because there was no contract between the District and Monsanto should also be rejected because "[t]here is no requirement of privity, and victims of indirect injuries are permitted to sue under the Act."  Id. (citation omitted).  Additionally, it is conclusively established that proof of reliance is not required to sustain a claim under GBL § 349.  Stutman v. Chemical Bank, 731 N.E.2d 608, 612 (N.Y. 2000).

Lastly, there is no requirement in the Act that a plaintiff submit proof of false advertising to defeat a motion to dismiss a GBL § 349 claim.  All a plaintiff is required to plead is that a defendant's materially and deceptive and misleading practices caused injury to plaintiff.  The District's allegations in its GBL § 349 claim along with those made elsewhere in the complaint are more than sufficient to withstand Monsanto's motion.

### H.    <u>Declaratory Judgment</u>

Monsanto moves this Court to dismiss the District's Declaratory Judgment claim for hypothetical future injuries.  Monsanto does not, however, move this Court to dismiss the District's Declaratory Judgment claim as it relates to costs it has *already* incurred for "testing, removing and disposing of the PCB Contaminated Material and PCB Contaminated Soil."  Complaint, ¶¶ 175-77.   As such, even if this Court  agrees that future injuries are not ripe for the District's Declaratory Judgment claim, the District's claims for its past response costs should not be dismissed.

### I.    <u>Punitive Damages</u>

Monsanto argues that the District's complaint has inadequately plead the requisite facts so as to warrant a viable claim for punitive damages.   Defs' Mem. at 22.  Monsanto's argument should fail for at least three reasons.   First, the level of egregiousness required to maintain a claim for punitive damages described by Monsanto is an incomplete statement of New York law, setting the bar defectively high.  Punitive conduct need not be intentionally harmful but may consist of actions which constitute willful or wanton negligence or recklessness. <u>See</u> <u>Giblin v. Murphy</u>, 532 N.E.2d 1282 (N.Y. 1988).  Second, discovery in this action has yet to commence, and as such, it would be premature to dismiss the District's punitive damage claim at this juncture.  Third, the District has sufficiently plead the requisite facts supporting punitive damages.  <u>See</u> Compl. ¶¶ 23-33, 36, 48, 94-97, 101-104.   Alternatively, the District has cured any deficiency by filing its Amended Complaint.

**POINT III**

III.    **THE DISTRICT IS NOT SEEKING DAMAGES ASSOCIATED WITH 2003 WINDOW REPLACEMENT**

Monsanto argues that the District should not be able to recover property damages relating to the District's 2003 window caulk removal.  Defs' Mem. at 22.  The District does not take issue with this statement, as the District has never sought damages relating to this initial project.  However, Monsanto has attempted to muddy the waters and extend this damage-limitation to the District's valid damage claims.  Monsanto is correct in its statement that the District's removal of the window caulking had nothing to do with PCBs – but only as to the initial 2003 renovation project.  Subsequent remediation, the remediation that is at the heart of this matter, as laid out in the District's Complaint, was done so solely because of the presence and inherent danger of Monsanto's PCBs.  For the sake of clarity, the District is not seeking damages relating to its 2003 renovation project as detailed in ¶ 59 of its Complaint.  It is, however, seeking damages relating to the PCB remediation of the ground (Compl. ¶ 65); soil (Compl. ¶¶ 73-75); building surfaces (Compl. ¶¶ 76, 79) and sidewalks (Compl. ¶¶ 82-85).

**<u>CONCLUSION</u>**

The dismissal of the District's causes of action requested by Monsanto is simply unwarranted.  As stated above, the only time a court should dismiss a complaint is if it determines that, substantively speaking, the complaint as a whole "fails to state a cause of action."  <u>Foley v. D'Agnastino</u>,  248 N.Y.S.2d 121, 126 (1st Dep't 1964).  "However imperfectly, informally or even illogically the facts may be stated, a Complaint, attacked for insufficiency, is deemed to allege whatever can be implied from its statements by fair

and reasonable intendment." <u>Id.</u> (citing <u>Kain v. Larkin</u>, 36 N.E. 9 (N.Y. 1894)); <u>see also</u> <u>Gray v. Rochester Gas & Elec. Corp.</u>, 468 N.Y.S.2d 791 (4th Dep't 1983) ("Under our liberal pleading rules a motion to dismiss should be denied if any cause of action may be discerned from the pleadings").  Substantively speaking, the District's Complaint sets forth specific facts that give rise to numerous causes of action based on Monsanto's acts and omissions, and articulates the harm the District has suffered as a consequence of Monsanto's conduct.

The District's Complaint plainly provides Monsanto with more than sufficient notice of the factual basis upon which the District seek to hold it liable, and thus, satisfies the pleading requirements of New York law.  Monsanto has utterly failed to meet its respective burden for dismissal and its motion to dismiss should be denied.  For all of the foregoing reasons, the District respectfully urges this Court to deny the relief sought by Monsanto.

Dated: February 14, 2008                    Respectfully submitted,


                                            <u>Kevin Madonna /s/</u>
                                            Kevin J. Madonna (KM-5595)
                                            Robert F. Kennedy, Jr. (RK-5906)
                                            Kennedy & Madonna, LLP
                                            48 Dewitt Mills Road
                                            Hurley, New York 12443
                                            845-331-7514
                                            kmadonna@kennedymadonna.com
                                            *Attorneys for Plaintiff Yorktown School*
                                            *District*

# EXHIBIT 1



RECEIVED
JAN 1 4 2008
USDC-WP-SDNY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

YORKTOWN CENTRAL
SCHOOL DISTRICT,

                Plaintiff,

           vs.

MONSANTO COMPANY,
PHARMACIA CORPORATION,
PECORA CORPORATION and
JOHN DOES 1-20.

           Defendants.

-------------------------------------------------------x

Civil Action No. 07-CIV-8648
(SCR)

<u>ECF CASE</u>

FIRST AMENDED COMPLAINT


JURY TRIAL DEMANDED

      Plaintiff Yorktown Central School District ("the District" or "Plaintiff") by its attorneys KENNEDY & MADONNA, LLP for its verified complaint against Defendants, alleges upon information and belief as follows:

<u>**NATURE OF ACTION**</u>

      1.    This is a products liability and negligence lawsuit resulting from Defendants' design, manufacturing, distribution, marketing, selling and utilization of the now outlawed carcinogen, Polychlorinated Biphenyls ("PCBs"), in the construction of the District's schools. This lawsuit seeks damages from Defendants for: (1) remediation costs and expenses, including attorneys' fees associated with the District's removal and proper disposal of PCBs from its schools and surrounding areas; (2) any and all future remediation costs and expenses, including attorneys' fees, to be incurred by the District; (3) any and all incidental and consequential damages resulting from Defendants' actions including indemnification for any claims regarding

PCB exposure that may be brought against the District by past and/or current students, teachers and/or employees of the District as well as any other persons; and (4) a declaratory judgment declaring that Defendants are responsible for the District's damages as described herein and shall indemnify the District for any and all costs related to (i) past remediation of PCB contaminated materials and property at its buildings; (ii) future remediation costs associated with PCB contamination, and; (iii) any claims regarding PCB exposure that may be brought against the District by past and/or current students, teachers and/or employees of the District as well as any other persons.

## I.     Parties

2.     Plaintiff Yorktown Central School District is a school district existing under the laws of the State of New York.

3.     Defendant Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri.

4.     Defendant Pharmacia Corporation ("Pharmacia") is a Delaware corporation with its principal place of business, according to Pharmacia, in Peapack, New Jersey.  Pharmacia exists as a wholly-owned subsidiary of Pfizer, Inc.

5.     Pecora Corporation ("Pecora") is a Pennsylvania corporation with its principal place of business in Harleysville, Pennsylvania.

6.     Upon information and belief, Defendants John Does 1-20 were distributors, marketers, suppliers, designers or sellers of products containing PCBs.  Although their identities are unknown, their names will be ascertained during discovery at which time Plaintiff will seek leave of this Court to add their actual names to the complaint.

2

7.      As used herein, the term "Defendants" refers to all Defendants collectively -
Monsanto Company, Pharmacia, Pecora and John Does 1-20.

## II.      Jurisdiction and Venue

8.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity
of citizenship and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00),
exclusive of interest and costs.

9.      Venue is appropriate in this dispute pursuant to 28 U.S.C. § 1391(b) because a
substantial part of the events giving rise to this claim occurred in Westchester County, New
York.

## III.      Background

10.     PCBs are mixtures of up to 209 individual chlorinated compounds (known as
congeners) manufactured by the Monsanto Chemical Company and its successor, Monsanto
Company (collectively referred to as "Old Monsanto"), from 1935 to 1971.

11.     PCBs are either oily liquids or solids that are colorless to light yellow in
appearance.

12.     Old Monsanto was the exclusive manufacturer of PCBs in the United States.

13.     Many commercial PCB mixtures are known in the United States by the trade
name Aroclor.

14.     There are no known natural sources of PCBs in the environment.

15.     Once in the environment, PCBs do not readily break down and therefore may
remain for very long periods of time.

3

16.    The United States federal Environmental Protection Agency ("EPA") and the International Agency for Research on Cancer have determined that PCBs are probably carcinogenic to humans.

17.    The manufacture of PCBs was banned in the United States in August 1977 due to its toxic and hazardous characteristics.

18.    PCBs easily cycle between air, water, and soil and are present as solid particles or as a vapor in air.

19.    Heavy kinds of PCBs are more likely to settle into sediments while lighter PCBs are more likely to evaporate to air.

20.    Scientific studies suggest that PCBs mobilize from PCB containing caulking thereby contaminating the perimeter of affected buildings. See Herrick, et al., Soil Contamination from PCB-Containing Buildings, 115 Envt'l Health Perspectives 2 (Feb. 2007).

21.    Scientific studies demonstrate that PCBs in caulking migrate from the caulking into surrounding materials such as brick, masonry and concrete.

22.    Sediments that contain PCBs can also release PCBs into surrounding waters.

23.    Lighter weight PCBs may leave soil through evaporation and, as a gas, can accumulate in the leaves and above-ground parts of plants and food crops.

24.    According to the federal Agency for Toxic Substances and Disese Registry ("ATSDR"), if you breathe air that contains PCBs, the PCBs can enter your blood through your lungs and subsequently enter your bloodstream.

25.    According to ATSDR, PCBs can also enter your body through skin contact in buildings containing materials containing PCBs.

4

26.    According to ATSDR, PCBs can also enter your body through contact with contaminated soil.

27.    According to ARSDR, although children are exposed to PCBs through the same pathways as adults, their intake of PCBs per kilogram of body weight may be greater than adults.

28.    Based on the evidence for cancer in animals, the Department of Health and Human Services has stated that PCBs may reasonably be anticipated to be carcinogens.

29.    Old Monsanto was aware of reports in the late 1930's and the 1940's that indicated that prolonged and excessive occupational exposure to PCBs might cause liver effects in humans.

30.    An Old Monsanto memorandum dated September 20, 1955, stated: "We know Aroclors [PCBs] are toxic but the actual limit has not been precisely defined."

31.    An Old Monsanto memorandum issued in the 1950's stated that it was the opinion of Old Monsanto's Medical Department that the eating of lunches in manufacturing process departments, including those in which PCBs were manufactured, should not be allowed.

32.    In late 1968, Old Monsanto received an initial report that some people in Japan became ill from eating rice oil contaminated with Japanese manufactured PCBs.

33.    In 1969, Old Monsanto appointed an ad hoc "committee" to prepare a resume of the situation concerning the environmental contamination through the manufacture and use of PCBs.

34.    A draft document dated October 2, 1969, contained the following statements: "The objective of the committee was to recommend action that will: 1. Protect continued sales and profits of Aroclors; 2. Permit continued development of new uses and sales, and; 3. Protect

5

the image of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or control contamination of the global ecosystem."

35.    A draft document dated October 2, 1969, includes the following statements: "The committee believes there is little probability that any action that can be taken will prevent the growing incrimination of specific [PCBs] (the higher chlorinated - e.g. Aroclors 1254 and 1260) as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish-eating birds. There are, however, a number of actions which must be undertaken in order to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series."

36.    A draft document dated October 2, 1969, contained the following statement under the heading "Budgetary Considerations": "The committee recognizes the restrictions placed on those currently involved by mandates to operate within normal or proposed reduced budgets. It should be clear, however, that the product groups, the Division and the Corporation are faced with an extraordinary situation. There cannot be too much emphasis given to the threat of curtailment or outright discontinuance of the manufacture and sales of this very profitable series of compounds. If the products, the Division and the Corporation are to be adequately protected, adequate funding is necessary."

37.    During 1970, Old Monsanto received reports that cows which ingested PCBs that apparently had been contained in silo sealant produced milk that contained PCBs.

38.    A document dated January 26, 1970, and entitled, "The PCB- Pollution Problem" reflects a January 21 and 22, 1970 meeting between representatives of General Electric and Old Monsanto. This document contained the following statement: "In essence, results reported by Mr. Wheeler on chronic animal toxicity tests and animal reproducibility studies underway are not as favorable as we had hoped or anticipated. Particularly alarming is evidence of effect on hatchability and production of thin egg shells regards white leghorn chickens. The studies involved Aroclor 1242, 1254 and 1260. Some of the studies will be repeated to arrive at better conclusions."

39.    A letter dated October 20, 1974, from Joseph K. Wagoner of the Department of Health, Education, and Welfare, Public Health Service, Center for Disease Control, to Dr. Emmett Kelly at Old Monsanto stated: "A tremendous quantity of research has demonstrated that environmental exposure to [PCB's] causes serious impairment of the functions of the liver."

40.    A 1975 report by EPA sent to Old Monsanto confirmed that PCBs "pose a threat to human health and the environment."

41.    EPA banned the manufacture of PCBs in 1977 because of their toxic effects.

42.    Old Monsanto knew PCBs were hazardous but manufactured and profited from them for more than 40 years with conscious disregard for the rights of others.

43.    In 1997, Old Monsanto spun off certain chemical businesses, including those which previously manufactured PCBs, into Solutia, Inc. ("Solutia"), an independent, publicly owned company.

44.    As part of Old Monsanto and Solutia's agreement, Solutia agreed to indemnify Old Monsanto for claims, expenses and/or liability related to PCBs.

7

45.    In 2000, Old Monsanto merged with Pharmacia & UpJohn, Inc., and, upon merger, the company changed its name to Pharmacia Corporation.

46.    Later in 2000, Pharmacia Corporation created a wholly owned subsidiary (now publicly traded) called Monsanto Company ("New Monsanto").

47.    New Monsanto agreed to indemnify Pharmacia Corporation for claims, expenses and/or liability related to Old Monsanto's chemical business, including PCBs, to the extent such liability was not covered by the indemnity agreement with Solutia who agreed to also indemnify New Monsanto for claims, expenses and/or liability related to PCBs.

48.    The 2000 Separation Agreement between New Monsanto and Pharmacia Corporation stated that New Monsanto agreed to indemnify Pharmacia Corporation for various liabilities, including PCB lawsuits, "to the extent that Solutia were to fail to pay, perform or discharge those liabilities as contemplated in the Distribution Agreement."

49.    In 2002, New Monsanto, Pharmacia, and Solutia amended their distribution agreement to note that Solutia would indemnify New Monsanto as well as Pharmacia in regard to certain liabilities.

50.    On February 17, 2004, Solutia notified Pharmacia and New Monsanto that it was disclaiming its obligation to defend pending or future litigation related to liabilities it had assumed.[1]

---

[1] On December 17, 2003, Solutia and a number of its affiliates and subsidiaries filed for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Because of the automatic stay arising by virtue of Solutia's bankruptcy filing, and out of an abundance of caution, Solutia is not named as a defendant in this action. Further, all applicable statutes of limitation are automatically tolled pursuant to Section 108 of the Bankruptcy Code. The District expressly reserves any and all rights to pursue its claims against Solutia.

51.    Despite maintaining that Solutia remains obligated to continue to defend such litigation, New Monsanto decided to take the reins in litigation, including settling with adverse parties.

52.    New Monsanto has been active in paying litigation costs and also the costs of settlement of PCB related litigation -- for the benefit of Pharmacia as well as Solutia.  For example, in 2004, New Monsanto paid $1.3 million dollars to plaintiffs on behalf of Pharmacia in PCB litigation in Anniston, Alabama.

53.    Under threat of sanctions from the Department of Justice, New Monsanto also took over the remediation of a PCB-contaminated site in Sauget, Illinois, when Solutia defaulted.

54.    Despite several decades of evidence to the contrary, Pharmacia claimed in court documents as late as 2006 that "[t]he public perception of PCBs, fueled by decades of propaganda, is that they are extremely dangerous to people's health.  The truth is that PCBs are not particularly dangerous." Memorandum in Opposition to Plaintiffs' Motion to Remand, Abbatiello v. Monsanto Co., No. 06 CV 0266 (KWM), 2006 WL 1132289 (S.D.N.Y. Mar. 20, 2006).

## IV.

## PCBs IN THE YORKTOWN CENTRAL SCHOOL DISTRICT

55.    The District consists of the following schools: Brookside Elementary School; Crompond Elementary School; French Hill Elementary School; Mohansic Elementary School; Mildred E. Strang Middle School; and Yorktown High School.

56.    Upon information and belief, in or around 1969, the French Hill Elementary School ("French Hill") buildings were constructed.

57.     Upon information and belief, the French Hill buildings were built using materials containing PCBs, including, but not limited to, brick mortar caulking, sidewalk mortar caulking and window and door sealant caulking (the "PCB Contaminated Materials").

58.     As a result of the presence of the PCB Contaminated Materials, the soil in and around the French Hill buildings was also contaminated with elevated levels of PCBs (the "PCB Contaminated Soil").

59.     PCBs migrated from caulking containing PCBs into the air and were deposited on the District's soil.

60.     Upon information and belief, Old Monsanto manufactured the PCBs used in the PCB Contaminated Materials.

61.     The federal Toxic Substances Control Act ("TSCA") regulates PCBs and prohibits the use of PCBs in any manner other than in a totally enclosed manner.

62.     The use of PCBs in caulk is not in a totally enclosed manner.

63.     According to a July 26, 2007 EPA letter, "even though this caulk was applied before the regulations were developed, the caulk continues to serve its originally-intended purpose . . .[t]hus the [District] is continuing to make use of the PCB-containing caulk" which, according to EPA, is a violation of TSCA and EPA regulations therefore potentially subjecting the District to EPA enforcement actions.

64.     According to EPA, the continued use or presence of caulk containing PCBs is prohibited by TSCA and EPA regulations and is therefore illegal and must be removed.

65.     Violations of TSCA subject the violator to potential civil and criminal fines. 15 U.S.C. § 2615(b).

French Hill Window Replacement

66.     In or around 2003, the windows in the French Hill Elementary School ("French Hill") buildings were replaced and the window caulking was removed as part of a renovation project.

67.     Upon information and belief, subsequent to the windows being replaced, a Town of Yorktown resident discovered a piece of window caulking on the ground and, without the District's knowledge, submitted the caulking for analysis.

68.     The caulking collected by the Town of Yorktown resident contained 38,000 ppm of PCBs.

69.     Federal regulations prohibit the use of PCB containing materials where the PCB concentrations exceed 50 ppm.

70.     Upon information and belief, the test results were provided to the Westchester County Department of Health ("WCDOH").

71.     On October 8, 2004, WCDOH notified the District that it received a report indicating that there were elevated levels of PCBs in window caulking from French Hill (the "October 8, 2004 WCDOH Letter").

72.     In response to the October 8, 2004 WCDOH Letter, the District properly removed all window caulking that was on the ground outside French Hill and collected its own samples of caulking for testing.

73.     The District sent the caulking to be analyzed by a lab and received the results in January 2005.

11

74.     The District's test results confirmed that the window caulking from French Hill contained elevated levels of PCBs in violation of federal regulations.

French Hill Soil Tests

75.     Upon information and belief, in or around November 2004, the same individual who had the window caulking tested collected samples from French Hill in the general area where the windows were replaced and sent them for testing.

76.     The test results from these samples contained high levels of PCBs.

77.     Upon information and belief, in January 2005, WCDOH performed an independent soil investigation at French Hill in the area where the windows were replaced.

78.     Upon information and belief, the results from the soil sample indicated PCBs were present in the soil (the PCB Contaminated Soil) at levels significantly above the New York State Department of Environmental Conservation ("NYSDEC") clean up guidance level of one part per million for surface soils.[2]

79.     As a result of this information, the WCDOH directed the District to submit a work plan for the removal of the PCB Contaminated Soil.

80.     On or about August 5, 2005, after having its work plan approved by WCDOH, the District removed and disposed of approximately 591 cubic yards of soil.

81.     PCBs were detected at varying depths in the soil including up to two feet deep.

82.     The District incurred substantial costs in properly remediating and disposing the PCB contaminated Soil in accordance with the WCDOH work plan.

---

[2]  WCDOH required the District to clean up the soil in accordance with the NYSDEC clean up guidance of one part per million for surface soils.

83.    On or about August 30, 2005, "wipe tests" of the French Hill buildings revealed that there were building surfaces (including, but not limited to, window panes, building sills, doors and masonry expansion caulking) that contained levels of PCBs as high as 22,700 parts per million ("ppm").

84.    Federal regulations prohibit the use of PCB containing materials where the PCB concentrations exceed 50 ppm.

85.    In or around September 2006, EPA informed the District that the presence of PCBs in the French Hill buildings in the PCB Contaminated Materials and surrounding areas (the PCB Contaminated Soil) violates TSCA.

86.    Upon information and belief, the District has removed all of the known PCB Contaminated Materials at French Hill in accordance with all applicable federal, state and local laws and regulations.

87.    The District incurred substantial costs in properly removing the PCB Contaminated Materials.

2007 French Hill PCB Abatement Work

88.    As part of a French Hill construction project during the summer of 2007, testing was performed on the sidewalk expansion joint caulking to determine the presence of PCBs.

89.    As a result of said testing, on or about July 12, 2007, PCB abatement work was performed on the sidewalks at the French Hill campus.

90.    Approximately 180 linear feet of PCB contaminated sidewalk expansion joint caulking was properly removed and disposed of in accordance with all applicable federal, state and local regulations.

13

91.    In addition, in accordance with all applicable federal, state and local regulations, approximately one foot of concrete on either side of the sidewalk expansion joint caulking was removed to ensure that any concrete that contacted the PCB contaminated caulking was properly removed and disposed.

92.    The District has incurred, and continues to incur, substantial costs removing and disposing the contaminated sidewalk expansion caulking and surrounding concrete.

93.    As a result of the presence of PCBs in the PCB Contaminated Materials, the District's property has been damaged and has caused and may continue to cause the District to incur remediation costs associated with French Hill and its other school buildings.

94.    Upon information and belief, Old Monsanto designed, manufactured, distributed, marketed and/or sold all the PCBs that were used in the construction of the French Hill buildings.

95.    Upon information and belief, Old Monsanto designed, manufactured, distributed, marketed and/or sold all of the PCBs that were potentially used in the construction of additional District buildings and campuses.

96.    Upon information and belief, Pecora Corporation designed, manufactured, distributed, marketed and/or sold the caulking product containing the PCBs which have caused damage to the District.

97.    Upon information and belief, Pecora Corporation designed, manufactured, distributed, marketed and/or sold caulking containing PCBs throughout the United States.

98.    Upon information and belief, the PCB Contaminated Materials contaminated the PCB Contaminated Soil and caused the District's property to be damaged resulting in the District

14

incurring substantial remediation costs, including, but not limited to, testing, removal and disposal costs.

99.    As a result of Defendants' actions the District has been damaged and may continue to suffer damages in the future.

### V.    Claims Against Defendants

### FIRST CAUSE OF ACTION
### NEGLIGENCE AND RECKLESSNESS

100.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

101.    Defendants owed a duty of reasonable care to Plaintiff to design, manufacture, market, test, and perform quality assurance evaluations, sell and/or distribute PCBs or caulk containing PCBs in a safe condition.

102.    Defendants breached their duty because they failed to exercise reasonable care and/or were reckless in the design, sale, testing, quality assurance, marketing, packaging, warnings, advertising, promotion, monitoring and warning of adverse effects, and/or distribution of PCBs and caulk containing PCBs.

103.    Defendants' conduct was reckless and beyond all standards of common decency so as to permit the recovery of punitive damages.

104.    By reason of the foregoing, Plaintiff was and will be caused damages to its property and incur economic loss in an amount to be determined at trial.

105.    By reason of the foregoing, Plaintiff is entitled to compensatory and punitive damages.

15

## SECOND CAUSE OF ACTION
### STRICT PRODUCTS LIABILITY FOR MANUFACTURING DEFECT

106.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

107.   Upon information and belief, Plaintiff purchased and used Defendant Pecora Corporation's caulk containing PCBs.

108.   Defendant Pecora Corporation allowed PCBs to be placed in its caulking product in the manufacturing process.

109.   As a result of the contaminant and/or product defect, PCBs escaped from Defendant's caulk thereby contaminating Plaintiff's property.

110.   Pecora's caulking product was in a defective condition and unreasonably dangerous to Plaintiff when it left the Defendant's control.

111.   At all times, Defendants' caulking product containing PCBs and PCBs were used in the manner intended.

112.   Monsanto's PCBs were in a defective condition and unreasonably dangerous to Plaintiff when it left Defendant's control.

113.   PCBs and caulk containing PCBs, at the time they left Defendants' control, contained a manufacturing defect because they were designed in a manner that allowed the PCB molecules to escape, volatize, or mobilize thereby contaminating the District's buildings and property.

114.   By reason of the foregoing, Plaintiff was and will be caused damages to its property and incur economic loss in an amount to be determined at trial.

16

115.   By reason of the foregoing, Plaintiff is entitled to compensatory and punitive damages.

### THIRD CAUSE OF ACTION
### STRICT PRODUCTS LIABILITY – FAILURE TO WARN

116.   Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

117.   Defendants had a duty to warn Plaintiff and the general public of risks and/or defects about which it knew or should have known with respect to PCBs in general and specifically PCBs in caulking material.

118.   Defendants failed to adequately warn Plaintiff and the general public of the risks of PCBs and of caulk containing PCBs that was used by Plaintiff.

119.   Defendants also failed to effectively warn of dangers inherent with the use of PCBs and caulk containing PCBs due to its defective design, and/or defective manufacturing, and Defendants' misrepresentations and inadequate fact disclosures to the Plaintiff and the general public constituted the product unreasonably dangerous for normal use.

120.   The PCBs and PCB contaminated caulk manufactured and/or supplied by Defendants was unreasonably dangerous and defective because the product was not accompanied by proper warnings to Plaintiff and the general public regarding the product's toxicity.

121.   After Defendants knew or should have known of the risk of injury from PCBs and caulk containing PCBs, they failed to provide adequate warnings to users or consumers of the product and as a direct result thereof, the caulk containing PCBs manufactured and/or supplied by Defendants was defective due to inadequate post-marketing warning and/or instructions.

17

122.    By reason of the foregoing, Plaintiff was and will be caused damages to its property and incur economic loss in an amount to be determined at trial.

123.    By reason of the foregoing, Plaintiff is entitled to compensatory and punitive damages.

## FOURTH CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY – DESIGN DEFECT

124.    Plaintiff incorporates by reference all preceding paragraphs and allegations of this Complaint as though fully set forth herein and further alleges as follows:

125.    At all material times herein, PCBs and caulk containing PCBs manufactured and/or supplied by Defendants were placed into the stream of commerce by Defendants in a defective and/or contaminated and unreasonably dangerous condition in that the known and foreseeable risks associated with the use of this product exceeded the benefits associated with its design or formulation.

126.    Alternatively, PCBs and caulk containing PCBs manufactured and/or supplied by Defendants were defective in design and formulation such that when it was placed in the stream of commerce, it was unreasonably dangerous and/or was capable of becoming unreasonably dangerous.

127.    PCBs and caulk containing PCBs manufactured by Defendants were defective due to inadequate warnings or instructions since Defendants knew or should have known that the product created a risk of harm to consumers such as Plaintiff when used in the way it was intended to be used and in a manner which was reasonably foreseeable by Defendants.

128.    PCBs and caulk containing PCBs manufactured and supplied by Defendants were defective due to inadequate warnings, inadequate testing, inadequate post-marketing warnings, inadequate post-marketing instructions, because after Defendants knew or should have known of the risk of injury from PCBs and caulking containing PCBs, they failed to provide adequate warnings to users or consumers of the product and failed to immediately address the threat their PCBs and caulk containing PCBs posed to Plaintiff and the public.

129.    PCBs and caulk containing PCBs were at the time they left Defendants' control, defective products because they were designed in a manner that allowed the PCB molecules to escape, volatize, and/or mobilize thereby contaminating the District's buildings and property.

130.    At all times, there was a feasible and safer alternative design for Defendants' products. For example, Monsanto Co. could have manufactured its PCBs in a manner that would eliminate the tendency of PCBs to escape or mobilize from the products the chemical was introduced into and Pecora Corp. could have designed its caulking product without including PCBs or design its caulk in a manner that reduced or eliminated the escape or mobilization of PCBs into the environment.

131.    PCBs and caulking containing PCBs were at the time they left Defendants' control, defective products, unreasonably dangerous for use, resulting in injury to Plaintiff as herein alleged.

132.    The defective and unreasonably dangerous condition of PCBs and caulking containing PCBs was the proximate cause of the damages and injuries sustained by Plaintiff.

133.    By reason of the foregoing, Plaintiff was and will be caused damages to its property and incur economic loss in an amount to be determined at trial.

134.    By reason of the foregoing, Plaintiff is entitled to compensatory and punitive damages.

## FIFTH CAUSE OF ACTION
### VIOLATIONS OF NEW YORK'S GENERAL BUSINESS LAW

135.    Plaintiff incorporates by reference all preceding paragraphs and allegations of this Complaint as though fully set forth herein.

136.    Defendants are or were in the business of providing PCBs and materials containing PCBs to consumers in the State of New York, including Plaintiff.

137.    Defendants knew, or in the exercise of reasonable care, should have known that PCBs and caulk containing PCBs were not reasonably safe as designed, manufactured, tested, marketed, distributed and/or sold.

138.    Defendants knew that PCBs and caulk containing PCBs carried the risk of serious health and property risks to its intended users, including the Plaintiff herein.

139.    The Defendants' acts, representations and/or omissions constitute unconscionable commercial practices in connection with the sale of merchandise and false advertising and were deceptive and misleading practices within the meaning of New York's Consumer Protection from Deceptive Acts and Practices Act, General Business Law §§ 349 and 350.

140.    By reason of the foregoing, Plaintiff was and will be caused damages to its property and incur economic loss in an amount to be determined at trial.

141.    By reason of the foregoing, Plaintiff is entitled to damages and attorneys' fees as permitted by the General Business Law.

142.    Plaintiff seeks all available damages as a result of the above conduct by

Defendants, including but not limited to those set forth below.

143.    As a result of Defendants' conduct, Plaintiff was forced to remove PCB

contaminated caulking from its French Hill School facilities at great expense to Plaintiff.

144.    Plaintiff was required to ship all PCB contaminated materials to an approved

hazardous waste landfill at great expense and incurred significant legal expenses in the process.

145.    Plaintiff also seeks an award of punitive or exemplary damages against

Defendants.  Defendants engaged in willful, wanton, malicious, reckless and/or grossly negligent

conduct in disregard for the safety of Plaintiff and its teachers and students by supplying PCB

contaminated caulking to the District and not warning the District that its product contained a

hazardous substance.

146.    Defendants are also liable for costs and prejudgment and postjudgment interest as

provided by law.

**SIXTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201**

147.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth

herein and further alleges as follows:

148.    Old Monsanto was the sole manufacturer of the PCBs in the United States.

149.    Upon information and belief, in the 1970's the federal government determined

that there was a reasonable basis to conclude that the manufacturing, processing, distribution in

commerce, use, or disposal of PCBs, or a combination of such activities, presents an

unreasonable risk of injury to health and the environment.

21

150.    Under TSCA - 15 U.S.C. § 2605(e) "Polychlorinated biphenyls," it is illegal for a person to use PCBs.  None of the few exceptions contained in 15 U.S.C. § 2605(e) apply in the instant case.

151.    PCBs were present in and around the French Hill buildings.

152.    PCBs may be present in and around additional District-owned buildings.

153.    The EPA has determined that the District is in violation of TSCA because of the presence of PCBs in and around French Hill.

154.    As a result of the federal government's prohibition on the use of PCBs in caulk, the District tested, removed and disposed of the PCB Contaminated Material and the PCB Contaminated Soil in and around the French Hill buildings in accordance with all local, state and federal regulations.

155.    The District incurred substantial costs testing, removing and disposing of the PCB Contaminated Material and PCB Contaminated Soil.

156.    As a result of the PCB Contaminated Materials and the PCB Contaminated Soil, the District and the District's property has been damaged.

157.    As a result of the foregoing, pursuant to 28 U.S.C. § 2201, the District is entitled to a declaratory judgment declaring that Defendants are responsible for and shall indemnify the District for the costs of investigation, remediation and other damages and expenses, including attorneys fees, related to the PCB Contaminated Materials and the PCB Contaminated Soil at the District's buildings.

158.    As a result of the foregoing, pursuant to 28 U.S.C. § 2201, the District is entitled to a declaratory judgment declaring that Defendants are responsible for and shall indemnify the

22

District for any potential costs and expenses, including attorneys fees, of investigation,

remediation and other damages related to any PCB contamination.

159.    As a result of the foregoing, pursuant to 28 U.S.C. § 2201, the District is entitled

to a declaratory judgment declaring that Defendants are responsible for and shall indemnify the

District for any costs and expenses, including attorneys fees, associated with any actions brought

against the District by past and current students, teachers and employees of the District as well as

any other persons.

### VI.    Jury Demand

160.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

WHEREFORE, Plaintiff Yorktown Central School District respectfully requests that Defendants be cited to appear and answer, and that upon final hearing, Plaintiff recover all available damages, interest, and costs and all other relief to which it is justly and properly entitled.

Dated:  February 14, 2008.

Respectfully submitted,

KENNEDY & MADONNA, LLP

Kevin J. Madonna (KM 5595)
Robert F. Kennedy, Jr. (RK 5906)
48 Dewitt Mills Road
Hurley, New York 12443
Telephone:    845-331-7514
Facsimile:    845-230-3111
kmadonna@kennedymadonna.com

24